RECORD NO. 15-4272

In The
# United States Court of Appeals
For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## BERNARDO AUGUSTINE LLOYD,

*Defendant – Appellant*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT GREENBELT

───────────

### BRIEF OF APPELLANT

───────────

**Richard A. Finci**
**Jennifer L. Mayer**
**HOULON, BERMAN, FINCI,**
  **LEVENSTEIN & SKOK, LLC**
**7850 Walker Drive, Suite 160**
**Greenbelt, Maryland 20770**
**(301) 459-8200**

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.................................................................1

    A.    Subject Matter Jurisdiction..................................................1

    B.    Appellate Jurisdiction.........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE.................................................................2

    Statement of the Facts.............................................................3

SUMMARY OF ARGUMENT .................................................................9

ARGUMENT ................................................................................10

    I.    THE POST-INDICTMENT DELAY VIOLATED MR. LLOYD'S SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL AND THE INDICTMENT SHOULD HAVE BEEN DISMISSED ................................................................10

        a.    The Fifteen Month Delay Between Indictment And Arrest Was Uncommonly Long .................................12

        b.    The Delay Should Be Weighed Heavily Against The Government.........................................................13

        c.    Mr. Lloyd Asserted His Right To A Speedy Trial....................19

        d.    Mr. Lloyd Suffered Prejudice As A Result Of The Delay .......19

II.     THE    COURT    ERRED    IN    PERMITTING    THE
        GOVERNMENT'S  EXPERT  CHARLES  RUSSELL  TO
        RENDER  OPINIONS  AS  TO  THE  CAUSE  OF  THE
        ACCIDENT WHEN HIS TESTIMONY DID NOT MEET THE
        REQUIREMENTS OF FED. R. EVID. 702 ........................................26

III.    THE  TRIAL  COURT  ERRED  IN  FAILING  TO  APPLY  A
        DOWNWARD  ADJUSTMENT  UNDER  U.S.S.G.  §  3E1.1
        FOR MR. LLOYD'S ACCEPTANCE OF RESPONSIBILITY ........32

CONCLUSION .......................................................................................36

REQUEST FOR ORAL ARGUMENT ................................................37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Barker v. Wingo,
    407 U.S. 514 (1972)...............................................................................passim

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)......................................................................................30

Doggett v. United States,
    505 U.S. 647 (1992)...............................................................................passim

Strunk v. United States,
    412 U.S. 434 (1973)......................................................................................14

United States v. Benn,
    572 Fed. Appx. 167 (4th Cir. 2014) ............................................................30

United States v. Broussard,
    987 F.2d 215 (5th Cir. 1993) .......................................................................34

United States v. Collins,
    550 Fed. Appx. 143 (4th Cir. 2014) ............................................................34

United States v. Dugger,
    485 F.3d 236 (4th Cir. 2007) .................................................................32, 33

United States v. Eccleston,
    2015 U.S. App. LEXIS 13376 (4th Cir. Md. July 31, 2015) .................10, 13

United States v. Garcia,
    752 F.3d 382 (4th Cir. 2014) .................................................................29, 30

United States v. Grimmond,
    137 F.3d 823 (4th Cir. 1998) .......................................................................14

iii

United States v. Hall,
551 F.3d 257 (4th Cir. 2009) ..........................................................13, 14, 20

United States v. Holt,
79 F.3d 14 (4th Cir. 1996) ...........................................................................35

United States v. Leadbetter,
364 Fed. Appx. 847 (4th Cir. 2010) ............................................................32

United States v. Nale,
101 F.3d 1000 (4th Cir. 1996) .....................................................................33

United States v. Redding,
422 Fed. Appx. 192 (4th Cir. 2011) ............................................................33

United States v. Thomas,
55 F.3d 144 (4th Cir. 1995) ...................................................................11, 14

United States v. Wilson,
484 F.3d 267 (4th Cir. 2007) .......................................................................29

United States v. Woolfolk,
399 F.3d 590 (4th Cir. 2005) .......................................................................12

## CONSTITUTIONAL PROVISION

U.S. Const. amend. VI.........................................................................2, 10, 11, 26

## STATUTES

18 U.S.C. § 924.................................................................................................34

18 U.S.C. § 1112(a) ......................................................................................1, 2

18 U.S.C. § 3231 ...............................................................................................1

28 U.S.C. § 1291 ...............................................................................................1

Md. Code. Trans. Art. 21-901.1(a) ...............................................................1, 2

**RULES**

Fed. R. Evid. 702 ................................................................26, 30, 32

Fed. R. Evid. 702(b)....................................................................28

Fed. R. Evid. 702(c)....................................................................28

Fed. R. Evid. 702(d)....................................................................28

**REGULATION**

36 C.F.R. § 4.2 ........................................................................1, 2

**GUIDELINE**

U.S.S.G. § 3E1.1 ................................................................passim

## STATEMENT OF JURISDICTION

A.    <u>Subject Matter Jurisdiction</u>

Bernardo Augustin Lloyd was prosecuted for one count of Involuntary Manslaughter in violation of 18 U.S.C. § 1112(a) and one count of Reckless Driving in violation of 36 C.F.R. § 4.2 and Md. Code. Trans. Art. 21-901.1(a). The United States District Court for the District of Maryland had subject matter jurisdiction pursuant to 18 U.S.C. § 3231.

B.    <u>Appellate Jurisdiction</u>

This appeal is from the final judgment of the District Court. The District Court denied Mr. Lloyd's pretrial motions on November 25, 2014, and sentenced Mr. Lloyd on May 6, 2015, following a guilty verdict returned by the jury. Mr. Lloyd filed a timely Notice of Appeal on May 12, 2015. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Mr. Lloyd argues that the District Court's erred in: denying his Motion to Dismiss Indictment; permitting the Government's expert witness to give certain opinions; and denying Mr. Lloyd an adjustment from his sentencing guidelines for acceptance of responsibility.

1

## STATEMENT OF THE CASE

On June 25, 2012, a grand jury for the District of Maryland handed down an indictment, charging Mr. Lloyd with one count of Involuntary Manslaughter in violation of 18 U.S.C. § 1112(a) and one count of Reckless Driving in violation of 36 C.F.R. § 4.2 and Md. Code. Trans. Art. 21-901.1(a). (J.A. 13). A warrant was issued for Mr. Lloyd's arrest the same day. (J.A. 13). Mr. Lloyd was arrested in this matter on September 23, 2013. (J.A. 23).

Mr. Lloyd filed a pre-trial Motion to Dismiss Indictment alleging that the fifteen month delay between the grand jury indictment and his arrest violated his Sixth Amendment right to a speedy trial. (J.A. 15-22). The District Court held an evidentiary hearing on Mr. Lloyd's Motion to Dismiss on November 25, 2014. At the conclusion of the hearing, the District Court orally denied Mr. Lloyd's motion. (J.A. 123:18-24).

Mr. Lloyd proceeded to trial before a jury on December 17, 18, and 19, 2014. Mr. Lloyd filed several Motions in Limine prior to and during the trial, arguing that the Government should be precluded from presenting certain evidence in its case-in-chief. In one such motion, Mr. Lloyd argued that the Government's expert witness should be precluded from presenting certain opinions to the jury because those opinions lacked a proper foundation. (J.A. 139-143). The District Court denied Mr. Lloyd's motion and declined to limit the expert's testimony. At

the conclusion of the evidence, the jury returned a guilty verdict as to Involuntary Manslaughter and was instructed not to return a verdict as to Reckless Driving.

The District Court held a sentencing hearing on May 6, 2015. Mr. Lloyd argued that he should be granted an adjustment from his sentencing guidelines pursuant to U.S. Sentencing Guideline § 3E1.1 for his acceptance of responsibility. (J.A. 319:13-322:19). The Court declined to grant Mr. Lloyd an adjustment in his sentencing guidelines, (J.A. 328:1-2), found his guidelines to be 51-63 months, (J.A. 328:8-9), and imposed a sentence of 63 months imprisonment and 3 years supervised release. (J.A. 366).

Mr. Lloyd filed the present appeal on May 12, 2015. (J.A. 364).

**Statement of the Facts**

In the afternoon on January 31, 2012, Mr. Lloyd was travelling in his 2006 blue Lexus sedan (J.A. 298:21-2) on the inner loop of the Capital Beltway, (J.A. 299:24-300:2), with his adult son Jharvae Simmons (J.A. 299:14-6), in the front passenger seat. (J.A. 299). At approximately 2:00 in the afternoon, Mr. Lloyd exited the Beltway and entered onto the southbound Baltimore-Washington Parkway. (J.A. 299:24-300:10). The initial stretch of the Parkway had only two southbound lanes. (J.A. 305:25-306:9). Shortly after entering the Parkway, Mr. Lloyd noticed a dark-colored vehicle that he thought to be a Nissan, coming up behind him at a high rate of speed. (J.A. 301:7; 301:20-302:2). Believing that the

speeding Nissan was a police cruiser, Mr. Lloyd moved his vehicle from the left-hand lane to the right-hand lane to allow the Nissan to pass him. (J.A. 302:18-303:2; 313:12-314:2). After the Nissan had passed, he returned to the left-hand lane and used the clearing created by the speeding Nissan to pass the cars previously in front of him in the right-hand lane. (J.A. 303:11-304:6; 314:3-6). At some point, Mr. Lloyd switched back into the right-hand lane. (J.A. 305:23-4).

Mr. Lloyd's vehicle then approached a bend, which obstructed his view of the roadway ahead. (J.A. 305:5-7). After navigating the bend, he observed heavy traffic. (J.A. 305:7-10). There was a car immediately in front of him in the right-hand lane, and a red Ford F-150 pickup truck in front of the car. (J.A. 307:7-9). He also observed the Nissan in the left-hand lane next to him. (J.A. 305:23-4). At the point the Parkway expanded from two lanes to three lanes through the addition of a third lane to the right, (J.A. 305:25-306:9), Mr. Lloyd moved his vehicle into the far right-hand lane. (J.A. 305:25-306:16). The red pickup truck he had observed earlier suddenly pulled into the far right lane, in front of Mr. Lloyd's vehicle. (J.A. 307:13-4). Mr. Lloyd attempted to maneuver back into the center lane, but he aborted his attempt when he saw the Nissan moving from the left-hand lane into the center lane at the same time, very close to his vehicle. (J.A. 307:14-24; 308:2-8). Mr. Lloyd returned his vehicle back to the right-hand lane, behind the red pickup truck. (J.A. 307:22-4; 308:9-11).

Mr. Lloyd then observed the pickup truck apply the brakes. (J.A. 308:18-20). Mr. Lloyd swerved his vehicle to the right as fast as he could, but struck the rear bumper of the pickup truck. (J.A. 309:4-5). Mr. Lloyd's vehicle underrode the rear bumper of the pickup truck (J.A. 239:3-4), causing the pickup truck to roll (J.A. 154) and overturn (J.A. 154). The driver was ejected from the overturned vehicle. (J.A. 204). The Lexus came to a stop on the embankment to the right side of the roadway, in some weeds. (J.A. 151).

Mr. Lloyd escaped his vehicle and checked on his son. (J.A. 309:11-3). He then ran over to the overturned pickup truck to help the driver, but the driver was not moving and was unresponsive. (J.A. 309:17-23). It was immediately apparent that the pickup driver was deceased after having suffered blunt force head and neck trauma during the collision. (J.A. 309:17-24; 204). Other drivers stopped their cars and police officers arrived to the scene. (J.A. 310:8-10). Mr. Lloyd approached one of the officers and notified him that he was the driver of the other vehicle involved in the collision. (J.A. 310:10-4).

Mr. Lloyd and his son were transported to the hospital, but escaped the accident without serious injury. (J.A. 311:3-7). While at the hospital, Detectives Humberson and Luppino approached him and asked if he would give a statement about the accident (J.A. 311:8-19). He agreed to waive his rights and gave a full

5

verbal and subsequent written statement to the detectives. (J.A. 311:8-19), in order to "help in any way he could." (J.A. 311:20-2).

Mr. Lloyd was not arrested on January 31, 2012 when the motor vehicle accident occurred. (J.A. 91:12-3). The grand jury returned an indictment against Mr. Lloyd six months later, on June 25, 2012, and an arrest warrant was issued that same day. (J.A. 13). However, Mr. Lloyd was not arrested until September 23, 2013, nearly fifteen months after he was indicted. (J.A. 13). The Government finally served the arrest warrant on Mr. Lloyd after he was already in custody for an unrelated charge. (J.A. 53:12-20).

Officer Bentivegna of the U.S. Park Police Traffic Safety Unit, an expert in accident reconstruction, (J.A. 169-172) reported to the crash scene to investigate the accident. (J.A. 149). He evaluated the accident scene, had photographs taken, took measurements, and diagrammed the scene using a surveying device called a Total Station, and examined both the vehicles involved, (J.A. 148-153) in order to perform an accident reconstruction. (J.A. 345:9-19). He originally was not able to reach a conclusion as to the cause of the accident based on his analysis of the evidence he had gathered at the scene and the witness statements. (J.A. 173).

Two and a half years later, and two months before trial, he revisited the evidence he had gathered and the witness statements, at the request of the U.S. Attorney, and was able to reach a conclusion. (J.A. 173). He finally determined

that the "operator of the Lexus was going too fast to control his vehicle, failed to brake appropriately to avoid the collision and was driving in a reckless manner which is what led to the collision between the Lexus and the Ford F-150." (J.A. 173). He was not able to reach an opinion on the speed of the Lexus, (J.A. 173) due to a lack of information about the loss of momentum while the truck was rolling and scraping the roadway; loss of speed due to the Lexus' landing in a vegetative and mud-covered area; and energy loss during the collision. (J.A. 173).

In the weeks leading up to trial, the Government procured the services of Corporal Charles Gregory Russell of the Anne Arundel County Police Department, an accident reconstruction expert, who also operates a private accident reconstruction business on the side. The Government did not ask Corporal Russell to perform a new accident reconstruction, but simply asked whether he could determine the pre-impact speed of the Lexus. (J.A. 264:8-16; 293:6-14).

At trial, Corporal Russell testified for the Government as an expert in accident reconstruction. (J.A. 226:3-11). Corporal Russell testified to his estimates of the Lexus' speed prior to the collision. (J.A. 228-249) He arrived at his conclusions in part by combing data retrieved from the Lexus' Airbag Control Module ("ACM") with information he pulled from Lexus' website (J.A. 274:18-21), assumptions he made about the vehicles and their occupants that he

believed were reasonable (J.A. 275:2-276:15; 279:13-280:25), and portions of the witness statements that he found to be credible. (J.A. 288:22-289:5).

According to Corporal Russell, the ACM captures a vehicle's speed, revolutions per minute ("RPMs"), engine RPMs, and accelerator pedal position approximately every second for the five seconds leading up to a collision. (J.A. 230:13-8). Russell testified that the speed recorded on the Lexus' ACM, in this case, 78.3 miles per hour, may not be the actual speed of the vehicle. (J.A. 230:9-13, 19-25; 277:3-8). Russell plugged the data from the ACM and the variables he utilized into an Excel spreadsheet with formulas that he himself created to reach his conclusions. (J.A. 272:19-273:12). Based on his own calculations, Corporal Russell estimated the Lexus' speed at "approximately a hundred miles an hour, give or take ten miles an hour depending on what data set exactly you want to use." (J.A. 240: 18-22). The data sets involved unknown variables, such as the tire size of the Lexus (J.A. 240:25-241:2), the gear the vehicle was in (J.A. 241:2-6; 242:12-6), the change in velocity ("delta V") (J.A. 243:20-5), and the speed of the pickup truck (J.A. 244:13-8), as well as Russell's assumptions as to the Lexus' tire size and transmission gear ratio, and the occupants' weights.

In addition to the speed opinions, Russell also opined that the cause of the accident was the "excessive speed of the Lexus," (J.A. 252:13-6), and that there

was no indication that the driver of the pickup truck contributed to the cause of the collision. (J.A. 252:17-9).

Mr. Lloyd testified on his own behalf. (J.A. 296-315). He admitted that he was in the left lane, passing other cars, and going faster than the other cars. (J.A. 304:16-23; 315:3-6). He stated that when the pickup truck suddenly pulled in front of him, he attempted to avoid the accident by first pulling into the center lane and when the black Nissan made that impossible, he returned to his lane, only to see the truck brake in front of him. (J.A. 307:13-308:23). He swerved to the right, but unfortunately, was not able to avoid striking the pickup truck. (J.A. 308:4-5).

## SUMMARY OF ARGUMENT

The District Court erred in denying Mr. Lloyd's Motion to Dismiss the Indictment when the Government offered no explanation for the fifteen month delay between indictment and arrest and Mr. Lloyd suffered prejudice as a result of the delay. The District Court further erred in permitting Corporal Russell to testify as to the cause of the accident when he did not give an adequate basis for his opinion. The District Court finally erred in denying Mr. Lloyd an adjustment from his sentencing guidelines for his acceptance of responsibility, when he accepted responsibility for his actions throughout the proceedings and proceeded to trial to preserve his appellate rights on a legal issue and challenge whether the statute applied to his conduct.

# ARGUMENT

## I. THE POST-INDICTMENT DELAY VIOLATED MR. LLOYD'S SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL AND THE INDICTMENT SHOULD HAVE BEEN DISMISSED

Fifteen months elapsed between the grand jury indictment and Mr. Lloyd's ultimate arrest in this matter, through no fault of Mr. Lloyd. During that time, critical evidence was destroyed by the Government and forever lost to the defense. The Government's explanation for the lengthy delay was that "[serving the warrant] wasn't a priority of the United States Marshals." (J.A. 102:2-4). Nonetheless, the trial judge found that the Government's explanation for the delay constituted a "neutral" reason not to be weighed heavily against the Government. The defense also presented evidence to demonstrate the prejudice Mr. Lloyd suffered as a result of the delay, due to the Government's destruction of evidence during that period. The District Court ruled that Mr. Lloyd did not suffer prejudice as a result of the pre-arrest delay, despite strong evidence to the contrary and no evidence presented by the Government.

The Circuit Court will review de novo a district court's constitutional speedy trial determination. United States v. Eccleston, 2015 U.S. App. LEXIS 13376, *15 (4th Cir. Md. July 31, 2015).

The Sixth Amendment to the U.S. Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy…trial." U.S.

Const. amend. VI. In order to prove a Sixth Amendment violation in this context, a defendant "must show first that the Amendment's protections have been triggered by 'arrest, indictment, or other official accusation.'" United States v. Thomas, 55 F.3d 144, 148 (4th Cir. 1995) (quoting Doggett v. United States, 505 U.S. 647 (1992)). If the Sixth Amendment protections apply, the Court must make four separate inquiries: (i) whether delay before trial was uncommonly long; (ii) whether the government or the criminal defendant is more to blame for that delay; (iii) whether, in due course, the defendant asserted his right to a speedy trial; and (iv) whether he suffered prejudice as the delay's result. Barker v. Wingo, 407 U.S. 514, 531 (1972). To prevail on their speedy trial claim, the Defendant is obliged, under Barker, to establish that on balance, [the] four separate factors weigh in his favor. Thomas, 55 F.3d at 148.

The District Court found that the fifteen month delay between indictment and arrest was uncommonly long (J.A. 120:10-1), and sufficiently long to trigger an analysis of the remaining Barker v. Wingo, 407 U.S. 514 (1972) factors. (J.A. 121:5-7). The court also correctly found that Mr. Lloyd asserted his right to a speedy trial. (J.A. 121:20-2). The District Court found that the Government was responsible for the delay (J.A. 121), but erroneously found that the Government's explanation for the delay was neutral, rather than an explanation that should weigh heavily against the Government. (J.A. 121:7-16). The District Court further erred

in finding that Mr. Lloyd had not suffered prejudice as a result of the delay. As a result, the District Court denied Mr. Lloyd's Motion to Dismiss the Indictment and in so doing, erred.

### a. The Fifteen Month Delay Between Indictment And Arrest Was Uncommonly Long

The first factor is actually a double enquiry. Doggett, 505 U.S. at 651. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay. Id. (quoting Barker, 407 U.S. at 530-531). If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. Doggett, 505 U.S. at 652.

The Supreme Court has directed that post-accusation delay [is] presumptively prejudicial at least as it approaches one year. Doggett, 505 U.S. at 652 n. 1. One year is the point at which courts deem the delay unreasonable enough to trigger the Barker inquiry. Id. However, the Fourth Circuit has recognized that even a delay of eight months may be presumptively prejudicial in a case that involves little complexity. Woolfolk, 399 F.3d at 598. The Supreme Court has also recognized that the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge. Barker,

407 U.S. at 531. Thus, a delay of eight months can be said to be the "bare minimum needed to trigger judicial examination." See Doggett, 505 U.S. at 652.

In this case, the delay between accusation and arrest was fifteen months, nearly twice the bare minimum needed to trigger judicial examination. Moreover, the case involves only one defendant and two charges – one of which was a misdemeanor violation of the Maryland motor vehicle regulations. All of the conduct at issue occurred within minutes on a single day. It can hardly be said to be a complex case, as that term is commonly used in federal criminal cases.

The delay in this case is clearly inordinate and presumptively prejudicial, requiring an analysis of the remaining Barker factors. The District Court correctly found that the delay was uncommonly long (J.A. 120:10-1) and proceeded to analyze the remaining Barker factors.

**b.     The Delay Should Be Weighed Heavily Against The Government**

The second Barker factor, the reasons for the delay, is necessarily related to a proper assessment of the period of delay. United States v. Hall, 551 F.3d 257 (4th Cir. 2009). "The reasons for a trial delay should be characterized as either valid, improper, or neutral. On this factor, a reviewing court must carefully examine several issues, specifically focusing on the intent of the prosecution." United States v. Eccleston, 2015 U.S. App. LEXIS 13376, *16-17 (4th Cir. Md. July 31, 2015) quoting Hall.

Some reasons for delaying a trial are neutral, such as a missing witness, Hall, 551 F.3d 257, 272 (4th Cir. 2009) or an understaffed prosecutor's office, Strunk v. United States, 412 U.S. 434, 436 (1973). Other neutral reasons include: the prosecution was complicated, involving a serious, complex conspiracy charge that implicated multiple parties in at least two jurisdictions; pre-trial proceedings largely resulting from defense motions; and a mistrial. Id. Negligence or overcrowded courts are also considered neutral reasons. Barker, 407 U.S. at 531. Although labeled neutral, "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Id.

Improper reasons for delaying a defendant's trial are "weighted heavily against the government." Grimmond, 137 F.3d at 828 (quoting Barker, 407 U.S. at 531). Prosecutorial misconduct or bad intent on the part of the Government will cause a delay to be improper. See Hall, 551 F.3d at 272.

The Government is obligated to pursue an indicted defendant with reasonable diligence. See Doggett, 505 U.S. at 656 ("If the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as Doggett could not show specific prejudice to his defense."); see also Thomas, 55. F.3d at 150 (noting the need to determine whether Government's reasons for delay reach the level of

reasonable diligence). "Reasonable diligence" demands "serious effort[s]." Id. at 652. Negligence in performance of this duty, while weighed against the Government less heavily than a "deliberate attempt to delay trial," must "nevertheless…be considered since the ultimate responsibility for such circumstances must rest with the Government rather than the defendant." Barker, 407 U.S. at 531. "A defendant has no duty to bring himself to trial." Id. at 527.

There can be no doubt that in this case, the Government did not pursue Mr. Lloyd with reasonable diligence during the fifteen month period between indictment and arrest. In fact, the Government admitted that it made no efforts to arrest Mr. Lloyd during the delay, much less the "serious efforts" required by the Supreme Court. The Government did not allege that overcrowded dockets or understaffed Government offices accounted for the delay. The Government apparently simply wrote off the obligation to bring Mr. Lloyd to trial and declined to make even a minimal effort to arrest him. The Government's utter lack of diligence should be treated more harshly than a simple display of negligence that can constitute a more neutral explanation. The Court should impute bad intent on the part of the Government for ignoring the arrest warrant in this case. If the Court permits the Government to delay an indicted defendant's trial simply because the Government does not deem the defendant to be a priority, the Government will have the unfettered ability to deprive defendants of their Constitutional speedy trial

rights. A defendant, such as Mr. Lloyd, will have no ability to challenge the Government's decision about whether or not his speedy prosecution should have constituted a "priority."

It is apparent that the Government's inaction went beyond mere negligence because this defendant did everything a defendant could possibility do to make himself available for prosecution in a timely manner. Had the Government made even the slightest effort to arrest Mr. Lloyd, it is extremely likely that Mr. Lloyd would have been quickly apprehended and subjected to prosecution. Mr. Lloyd frequently contacted the detective in this case and made his whereabouts and contact information known to law enforcement.

At the Motions Hearing, Mr. Lloyd testified that he voluntarily gave Detective Humberson his cell phone number and address on the day of the accident. (J.A. 48:12-23). Mr. Lloyd testified that he and Humberson were in contact 10-15 times about the case through his cell phone (J.A. 49:2-19). Mr. Lloyd said that Humberson contacted him and he contacted Humberson both to inquire about the status of the investigation and to retrieve personal property from his vehicle, which was in the custody of the U.S. Park Police. (J.A. 49:19-23). Humberson confirmed that he spoke to Mr. Lloyd multiple times by phone prior to the warrant being served. (J.A. 91:15-9). Mr. Lloyd affirmed that he had the same local cell phone number and address on the day of the accident and the time of the

16

motions hearing, but was never contacted about the arrest warrant. (J.A. 47:2-6; 50:4-9; 50:22-4; 51:5-7). Mr. Lloyd and Detective Humberson both testified about an in-person meeting they had. (J.A. 50:10-5). Mr. Lloyd recalled that the meeting occurred in May or June 2012. (J.A. 50:16-9). Near the time the grand jury indictment was returned. Yet, during these contacts, Humberson never informed Mr. Lloyd that there was an active arrest warrant for him. (J.A. 50:22-4).

Mr. Lloyd's mother, Lydia Callendar, testified that her son resided with her at the address he provided to the detectives on the date of the accident and the date of the hearing, (J.A. 63:2-13) but no officer ever came to her address to seek out Mr. Lloyd or serve the warrant. (J.A. 63:14-7). The parties submitted a stipulation that Mr. Lloyd was on supervised release out of the U.S. District Court for the District of Columbia during the time the arrest warrant was active but unexecuted, submitted monthly reports to his probation officer from June – December 2012, all while the warrant was active, and saw his probation officer in person in October 2012. (J.A. 137). Mr. Lloyd confirmed that he was on supervised release and reported to his probation officer at least monthly during that time, (J.A. 51:11-24), until his supervised release ended in near the end of 2012. Ms. Callendar testified that a probation officer appeared at her home at some point between January 31, 2012 and the date of the Motions hearing to verify that Mr. Lloyd resided at the residence. (J.A. 63:18-22). Mr. Lloyd testified that he worked at the same job

17

during this time, (J.A. 47:14-6) but no officer ever came to his work to serve the warrant. (J.A. 51:8-10).

The Government did not even attempt to contradict this mountain of evidence that Mr. Lloyd was living openly in the community and available to be arrested and subject to prosecution in this case. Instead, the Government simply proffered that the U.S. Marshals Service never attempted to arrest Mr. Lloyd because he was not a priority for them. (J.A. 102:2-9). The Government essentially admitted that it was dilatory in performing its duty to diligently arrest Mr. Lloyd. Mr. Lloyd was able to demonstrate that he did not flee, made no attempts to evade arrest or secret his whereabouts, and could have been readily located with even minimal effort by the Government.

The District Court found that the U.S. Marshals did not act "diligently" to find Mr. Lloyd. (J.A. 104:6-8). Yet, the District Court found the reason for the delay to be neutral, rather than improper. (J.A. 118:22-4). The District Court believed that the delay was not motivated by bad faith, harassment, or a desire to seek a tactical advantage. (J.A. 121:9-11). This finding ignores the extreme negligence the Government exercised in this case when it deemed Mr. Lloyd to not be a "priority" and failed to make any attempt to bring him to trial.

Mr. Lloyd apparently never became a "priority" for the U.S. Marshals Service. Mr. Lloyd was only served the arrest warrant in this case after he was

18

already in custody on an unrelated matter out of the District of Columbia and his jailers discovered the open warrant. (J.A. 53:12-20). Had he not been arrested in that matter, it may well have taken much longer for the Government to do its duty and initiate the prosecution in this matter. The Government's extreme inattention to its duty to bring Mr. Lloyd to trial and respect his speedy trial rights should not be categorized as a "neutral" factor, but rather should weigh heavily against the Government in the <u>Barker</u> analysis.

### c.    Mr. Lloyd Asserted His Right To A Speedy Trial

The third <u>Barker</u> factor is whether the defendant made a timely assertion of his speedy trial rights. A defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right. <u>Barker</u>, 407 U.S. 521.

The District Court correctly found that Mr. Lloyd asserted his right to a speedy trial on the record during his arraignment. (J.A. 121:21-2). This is the earliest possible time Mr. Lloyd could have asserted his speedy trial right in this case and thus, his assertion should be entitled to the strongest evidentiary weight.

### d.    Mr. Lloyd Suffered Prejudice As A Result Of The Delay

The fourth <u>Barker</u> factor the Court is to consider is whether the defendant suffered prejudice as a result of the delay. The Supreme Court has identified three interests for consideration: (1) whether there was an oppressive pretrial

incarceration; (2) the anxiety and concern suffered by the accused; and (3) the possibility that the defense was impaired. United States v. Hall, 551 F.3d 257 (4th Cir. 2009) (citing Barker, 407 U.S. at 532).

The prejudice accrued during the pre-arrest delay in this case can only be of the third variety. However, Mr. Lloyd presented strong evidence that the defense was indeed impaired by the lengthy delay. Following the motor vehicle accident in this case, the Government took six months to indict Mr. Lloyd then an additional fifteen months to arrest him. That delay caused the most important evidence to be lost to the defense. The Government released or destroyed the vehicles involved in the motor vehicle accident before arresting Mr. Lloyd. As a result, Mr. Lloyd was unable to have a defense accident reconstructionist examine the vehicles when rendering conclusions about the cause of the accident. The District Court improperly concluded that Mr. Lloyd did not suffer prejudice as a result of the pre-arrest delay. (J.A. 122:1-3).

The District Court's finding was not supported by the evidence presented at the Motions Hearing. Following the accident in this case, the Government towed the involved vehicles to a secured lot operated by the U.S. Park Police. (J.A. 95:3-13). The vehicles were taken to the lot so that the U.S. Park Police could take measurements and do further investigation on the vehicles. (J.A. 96:23-97:12). A

Government accident reconstruction expert accessed the vehicles and examined them, then the U.S. Park Police released the vehicles from custody. (J.A. 151-52).

The Government did not present evidence as to when the vehicles were released or destroyed. Detective Humberson testified that someone from the U.S. Park Police released Mr. Lloyd's vehicle to an insurance company at an unknown time. (J.A. 92:10-3; 95:14-96:11). Mr. Lloyd testified that he met with Detective Humberson in May or June 2012 and saw his vehicle at that time. (J.A. 50:10-21). It is reasonable to conclude that the release must have occurred after that meeting. Humberson testified that he also released the Ford pickup truck to an insurance company. (J.A. 92:17-22). He did not know if he took any notes or retained any documents related to releasing the vehicles. (J.A. 94:5-95:2).

The defense presented Wendell Cover as an expert witness in the field of accident reconstruction. (J.A. 59:10-4). Mr. Cover testified that he first requested to examine the vehicles in October 2013, the month following Mr. Lloyd's arrest. (J.A. 74:6-8). Mr. Cover testified that he did not examine the vehicles involved in the accident because he was advised that the vehicles were no longer available. (J.A. 70:5-10). He did examine the police report, police scene photographs, a video taken at the scene, some aerial photographs, and the results of forensic mapping of the scene. (J.A. 70:1-4). He also received data downloaded from the airbag control module on the Lexus. (J.A. 81:9-19).

Mr. Cover explained the five levels involved in an accident investigation, including the fourth level, accident reconstruction, which addresses how the accident occurred. (J.A. 73:6-74:1). To conduct this level, he testified that he would typically examine a vehicle to look at the "damage profile," imprints, and "autograph evidence" that resulted from the accident. (J.A. 70:13-22). He would take measurements and create a "crush profile" to orient the two vehicles together at the time of impact and at the time of maximum engagement. (J.A. 70:20-5; 71:1-5). He testified that the only way to get this information is through a direct examination of the vehicles. (J.A. 70:25-71:1). He would use this information, along with diagrams and measurements of the roadway, to reach an ultimate conclusion as to the cause of the accident. (J.A. 71:9-22).

While Mr. Cover did view photographs from the scene, which were provided to the defense in discovery, he did not find those photographs sufficient to replace the vehicle examination he would ordinarily conduct. (J.A. 72:1-4). The photographs were not sufficiently detailed and did not show some portions of the vehicles at all. (J.A. 72:6-14). He confirmed that there are cases in which it is possible to reach a conclusion as to the cause of an accident based on photographs and absent a vehicle examination. (J.A. 72-15-20; 79:2-5). However, this case did not fall into that category. Counsel informed the Court that a further type of

22

prejudice resulted from the destruction of the vehicles – the inability to know the Lexus' tire size for use in calculating speed from the ACM data. (J.A. 114:5-11).

The District Court judge questioned Mr. Cover about whether he could use the data retrieved from the airbag control module to determine the speed of the vehicle prior to the crash. (J.A. 80:17-81:19). Mr. Cover noted that it could be used to calculate a vehicle's speed, but is not meant to be a stand-alone piece of evidence and must be used in conjunction with a traditional reconstruction, which addresses impact, location and orientation of the crash. (J.A. 80:19-81:16).

In determining whether Mr. Lloyd suffered prejudice from the pre-arrest delay, the District Court attempted to determine if the Government's expert and Mr. Lloyd's expert would have access to the same information. (J.A. 106:16-109:17). The Government initially advised the Court that their accident reconstructionist did not have access to the vehicles, either, (J.A. 107:13-24), and only began to work on the case in 2014. (J.A. 110:12-20). However, the Government admitted that "there was work that was happening earlier." (J.A. 110:21-2). Mr. Lloyd's counsel informed the District Court that the "work" was actually a second Government accident reconstructionist who did have access to the vehicles before they were destroyed and took his own measurements and documented the parts of the vehicle that he believed to be important then rendered an accident reconstruction report in which he expressed an inability to determine

pre-crash speed of the vehicle. (J.A. 112:11-4; 114:19-22). The defense further informed the Court that the Government retained a second accident reconstructionist only after the present motion to dismiss indictment was filed. (J.A. 113:23-114:1). The Government did not present any corrections or take issue with this information.

Still, in its ruling, the District Court relied on the Government's original representation that the accident reconstructionist upon whose testimony it would rely at trial did not have the opportunity to view the vehicles, either. (J.A. 123:14-17) ("The government has proffered to me that it's going to have an accident reconstructionist to testify who's going to be doing so on the basis of the exact same information that's been available to the defense."). As the Government identified in its pre-trial discovery and the defense pointed out to the Court during the Motions Hearing, the Government did indeed have both the accident reconstructionist who examined the vehicles and the second accident reconstructionist testify at trial. Thus, the Court's determination that Mr. Lloyd suffered no prejudice because the "playing field was level" was erroneous and was not based on the record. The Government's expert had the opportunity to do exactly what the defense expert was unable to do in order to reach an opinion.

Moreover, the District Court somehow concluded that any evidence lost to the defense was lost in the period of time between the accident and the indictment.

(J.A. 122:18-21). There was not any evidence presented to support this conclusion. Mr. Lloyd testified that he saw his vehicle at the U.S. Park Police lot in May or June 2012, (J.A. 50:16-9), five to six months after the accident and very close in time to (or possibly even after) the June 25, 2012 indictment. Mr. Cover testified that he first requested to see the vehicles in October 2013, (J.A. 74:6-8), approximately one month after Mr. Lloyd's arrest. The Government did not present any evidence regarding when the vehicles were released from U.S. Park Police custody and Detective Humberson was adamant that he did not know when they were released. (J.A. 92:10-3; 95:14-96:11; 92:17-22). The only conclusion that can be reached from the evidence presented is that the vehicles were released at some point between May 2012 and October 2012. The pre-arrest delay spanned from the June 2012 indictment to the September 2013 arrest. The District Court's conclusion that any prejudice accrued prior to the indictment was not supported by the evidence and was erroneous.

The evidence presented at the Motions Hearing can only be interpreted to show that Mr. Lloyd suffered prejudice as a result of his delayed arrest. His expert witness testified that the accident reconstruction was necessary to show the cause of the accident, but he could not complete that reconstruction without examining the vehicles.

All four <u>Barker</u> factors weigh in favor of Mr. Lloyd and demonstrate that the fifteen month delay between indictment and arrest violated Mr. Lloyd's right to a speedy trial under the Sixth Amendment. Moreover, even if this Court was not persuaded that Mr. Lloyd suffered clear prejudice as a result of the pre-arrest delay, the other three <u>Barker</u> factors unequivocally weigh against the Government and should be apportioned such weight to tip the balance in Mr. Lloyd's favor. Any other finding would be tantamount to holding that establishment of sufficient prejudice is the *only* relevant factor under <u>Barker</u>. The only appropriate remedy is dismissal of the indictment with prejudice.

## II. <u>THE COURT ERRED IN PERMITTING THE GOVERNMENT'S EXPERT CHARLES RUSSELL TO RENDER OPINIONS AS TO THE CAUSE OF THE ACCIDENT WHEN HIS TESTIMONY DID NOT MEET THE REQUIREMENTS OF FED. R. EVID. 702</u>

Prior to the trial in this matter, the Government produced to the defense a report of its second accident reconstruction expert, Officer Charles Gregory Russell of the Anne Arundel County Police Department. Just weeks before the trial date, the Government engaged Corporal Russell to review the data downloaded from the Lexus' ACM and attempt to reach an opinion on the Lexus' pre-collision speed. (J.A. 254:2-12). Corporal Russell produced a report, which the Government provided to Mr. Lloyd in discovery. (J.A. 204-208). The report began by stating:

> The United States Park Police investigated/reconstructed this collision. In his analysis Officer Bentivegna, the investigating reconstructionist, stated he '…was unable

26

> to determine the pre-crash speed of the vehicle in this collision.'
>
> This investigation report is intended as a supplement to the investigation completed by the United States Park police and not to serve as a replacement. Its purpose is to specifically address the speeds of the vehicles involved in this collision. For that reason there will not be any in-depth discussions concerning items such as roadway evidence, weather, conditions, witness statements, and vehicle damage.

Corporal Russell devoted a majority of the report to an explanation and analysis of the data retrieved from the ACM in the Lexus. (J.A. 204-08). Corporal Russell made several hypotheses about other factors such as vehicle weight, tire size, gear, and the speed of the victim's vehicle to reach possible estimated speeds of the Lexus prior to the collision. Apparently, these estimates were not based on a complete accident reconstruction, which would require Corporal Russell to examine factors other than the ACM such as: roadway evidence, weather, conditions, witness statements, and vehicle damage, but ostensibly were entirely based on the data obtained from the ACM.

Following his calculations, Corporal Russell included a section entitled "Conclusion." He concluded:

> The available data establishes Vehicle #1 would have been traveling in excess of 50 miles per hour over the posted speed limit of 45 miles per hour when it struck Vehicle #2 in the rear. This conclusion is consistent with the statements of the various witnesses and supported by the known evidence. There is no indication the actions of

27

> the driver of Vehicle #2 contributed to the cause of this collision. Conversely, all of the available evidence indicates the sole cause of this collision was due to the reckless actions of the driver of Vehicle #1.

(J.A. 211).

In a pre-trial Motion in Limine, Mr. Lloyd challenged Corporal Russell's ability to present the opinions contained in the second part of Russell's conclusion, namely, "There is no indication the actions of the driver of Vehicle #2 contributed to the cause of this collision. Conversely, all of the available evidence indicates the sole cause of this collision was due to the reckless actions of the driver of Vehicle #1." (J.A. 139-43; 211). Mr. Lloyd's challenge rested on the requirements of Fed. R. Evid. 702(b), (c), and (d), because the opinions were not based on sufficient facts or data, were not the product of reliable principles and methods, and there was no indication that Corporal Russell had reliably applied the principles and methods to the facts of the case. (J.A. 139-43). The defense did not challenge Corporal Russell's ability to render an opinion on the vehicle's speed. (J.A. 143).

The District Court heard argument on Mr. Lloyd's Motion in Limine before permitting Corporal Russell to testify at trial. (J.A. 213:1-218:7). The defense argued that Corporal Russell did not articulate how he reached his conclusions regarding the cause of the accident, the driver of the pickup truck's actions, or Mr. Lloyd's recklessness. (J.A. 214:21-215:4; 216:23-217:12). The defense further argued that it appeared that Corporal Russell's opinions were not based on a

28

scientific analysis but rather were just a restatement of portions of the lay witness testimony. (J.A. 214:21-215:4; 216:23-217:12). The Government argued that Russell stated his methodology for arriving at the speed calculations and should be permitted to testify regarding his opinions in the report. (J.A. 216:14-217-3).

The District Court permitted Corporal Russell to testify to his opinions, subject to the Government establishing the foundation for those opinions and permitted the defense to have a continuing objection to the line of testimony. (J.A. 218:6). However, the Government never established the foundational requirements for Corporal Russell's testimony, yet, the jury considered his opinions anyway. The District Court erred in permitting this testimony.

The Circuit Court will review a district court's decision to qualify an expert witness, as well as the admission of such testimony, for abuse of discretion. United States v. Wilson, 484 F.3d 267, 273 (4th Cir. 2007). A court abuses its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding. United States v. Garcia, 752 F.3d 382, 390 (4th Cir. Md. 2014) (internal citations omitted).

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, "the trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant but reliable." United States v. Benn, 572 Fed. Appx. 167, 184 (4th Cir. 2014) citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). The Rule contemplates that an expert's opinion testimony will be "helpful to the jury," not merely helpful to the prosecutor as transmutations of simple fact testimony. United States v. Garcia, 752 F.3d 382, 393 (4th Cir. 2014).

Over the defense's continuing and specific objection, the Government was permitted to ask Corporal Russell "What is your opinion from the available evidence regarding the cause of this collision?" (J.A. 249:25-250:3). Defense counsel advised the District Court that he would not object to Russell stating that one car struck the other car, but he believed Russell was about to opine that reckless driving caused the collision and that Russell did not give a basis for that conclusion. (J.A. 250:15-23). The Court ruled, "Well, I think he's capable based on

what you've given him to give an opinion as to what was the cause of the accident. So the objection is overruled." (J.A. 251:1-4).

> Russell then opined that:

>> It's -- I guess it's a multifaceted answer. I mean the simplest cause is the Lexus drove into the back of the Ford. Now what caused that, I mean there's no question the speed is the major contributing factor involved in that. (J.A. 251:16-20).

> And then continued:

>> I guess the single thing, the excessive speed of the Lexus. If there was a single thing, I would have to put -- to answer it. So the excessive speed of the Lexus. (J.A. 252:14-6).

And finally, Russell opined that there was no indication that the actions of the [victim] contributed to the cause of the collision. (J.A. 252:17-9).

Russell gave these opinions despite never having revealed the methodology he employed to reach these conclusions. Russell's report contained no explanation of the principles and methods he utilized to determine that excessive speed was the, "major contributing factor" or that the victim's actions did not contribute to the accident. (J.A. 203-8). He did not fill-in the basis for these opinions during his testimony, either. He gave no reason to believe that these conclusions were based on any scientific methodology, rather than just a restatement of the lay witness opinions. Without this foundation, the Court was unable to determine whether the testimony is based on sufficient facts or data; the testimony is the product of

31

reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. Thus, the District Court should not have permitted Russell to testify to these opinions and erred in so doing.

## III. THE TRIAL COURT ERRED IN FAILING TO APPLY A DOWNWARD ADJUSTMENT UNDER U.S.S.G. § 3E1.1 FOR MR. LLOYD'S ACCEPTANCE OF RESPONSIBILITY

Mr. Lloyd accepted responsibility for his conduct and should have received a two level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The District Court failed to grant him a two level adjustment for his acceptance of responsibility. (J.A. 328:1-2). In so doing, the District Court clearly erred.

The Circuit Court reviews a district court's decision to deny an adjustment for acceptance of responsibility for clear error. United States v. Leadbetter, 364 Fed. Appx. 847, 848 (4th Cir. 2010). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Dugger, 485 F.3d 236, 239 (4th Cir. 2007).

Under U.S.S.G. § 3E1.1, a defendant who clearly demonstrates acceptance of responsibility for his offense is entitled to a two level reduction in his offense level. Comment 2 to U.S.S.G. § 3E1.1, addresses application of that adjustment after a defendant has been convicted at trial:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

The decision to grant an acceptance of responsibility reduction often depends on the actions of the defendant following his or her arrest or plea. United States v. Dugger, 485 F.3d 236, 240 (4th Cir. 2007). "[I]n order to receive a reduction under § 3E1.1 for acceptance of responsibility, the defendant must prove by a preponderance of the evidence that he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct." United States v. Redding, 422 Fed. Appx. 192, 195 (4th Cir. 2011) quoting United States v. Nale, 101 F.3d 1000, 1005 (4th Cir. 1996).

The guideline does not preclude a defendant, like Mr. Lloyd, who accepted responsibility for his conduct from moments after the crime occurred through the entire pre-trial process, yet went to trial to preserve his Constitutional challenge to

the Indictment and challenge whether the statute applied to his conduct, from receiving the benefit of the reduction. In fact, Mr. Lloyd fits squarely within the class of defendants that U.S.S.G. § 3E1.1, Comment 2 is intended to protect. Throughout the case, he clearly recognized and affirmatively accepted personal responsibility for his criminal conduct.

For example, in United States v. Broussard, 987 F.2d 215 (5th Cir. 1993), the Fifth Circuit Court of Appeals found that a District Court erred in failing to grant a defendant an adjustment under U.S.S.G. § 3E1.1 after the defendant went to trial. In that case, the defendant admitted ownership of guns found in his home and went to trial to contest that 18 U.S.C. § 924 applied to the facts that he had admitted. The Fifth Circuit found that the District Court clearly erred in not granting Mr. Broussard an adjustment for acceptance of responsibility.

By contrast, in United States v. Collins, 550 Fed. Appx. 143 (4th Cir. 2014), the Circuit Court found that the District Court did not clearly err in denying a defendant an adjustment for acceptance of responsibility. In that case, the defendant presented a defense that depended in part on legal arguments that his conduct did not constitute the charged crime. However, the appellate court agreed with the trial court that in addition to presenting a legal argument, the defendant sought to minimize his participation in the criminal activities by contesting several factual bases for the convictions. The appellate court agreed that this was not the

"rare" circumstance where a defendant should receive an adjustment for acceptance of responsibility after proceeding to trial.

Similarly, in United States v. Holt, 79 F.3d 14 (4th Cir. 1996), this appellate court found that a defendant convicted of being an inmate in possession of a weapon was properly denied the U.S.S.G. § 3E1.1 reduction, because the defendant did not go to trial to preserve issues unrelated to factual guilt and the District Court found the defendant's affirmative defense that he possessed the knife for self defense to be meritless and an attempt to minimize his culpability.

In this case, Mr. Lloyd accepted responsibility for his involvement in the automobile accident in this case throughout the pre-trial process. He never denied that he was speeding or caused the victim's death. At the scene of the accident, he identified himself to the responding officers as the driver of the vehicle involved in the crash. (J.A. 310:10-4). He voluntarily spoke to officers who came to interview him at the hospital, gave them a written statement in order to "help any way he could" (J.A. 311:8-19) and continued to speak with them by phone several weeks or months thereafter. (J.A. 91:15-9). Particularly, if the Court looks to his pre-trial statements and conduct, as the Comment directs the Court to do, it is readily apparent that Mr. Lloyd is a defendant who has accepted responsibility.

Even if the Court looks to Mr. Lloyd's conduct at trial, rather than the arguments propounded by defense counsel, Mr. Lloyd should receive the benefit of

his acceptance of responsibility. Mr. Lloyd testified at the trial in this matter in great detail about the accident and his own driving that day. He has never denied that he was travelling above the speed limit or involved in an accident. At trial, through counsel, he readily admitted his conduct and challenged whether the indictment was Constitutionally infirm and whether his conduct amounted to the charged offense, namely, whether his admitted illegal driving amounted to the gross negligence required for a reckless driving conviction. Such defenses do not preclude him from receiving the benefit of an adjustment for acceptance of responsibility.

Mr. Lloyd never minimized his involvement by arguing that he was not driving, was not speeding, or did not cause the death of the victim. The District Court did not find Mr. Lloyd's legal argument to be frivolous either, noting that Mr. Lloyd, "raised a very spirited issue with respect to the timeliness of this prosecution." (J.A. 326:24-5). Under these circumstances, the District Court clearly erred in denying an adjustment for acceptance of responsibility.

## CONCLUSION

The District Court erred in denying Mr. Lloyd's Motion to Dismiss the Indictment, in permitting the Government's expert to testify to certain opinions, and in failing to grant Mr. Lloyd an adjustment for his acceptance of responsibility.

36

For all of the foregoing reasons, Mr. Lloyd requests that his conviction be vacated and this case be remanded to the District Court.

## REQUEST FOR ORAL ARGUMENT

Mr. Lloyd hereby requests an oral argument.

/s/ Richard A. Finci
Richard A. Finci
Jennifer L. Mayer
HOULON, BERMAN, FINCI,
  LEVENSTEIN & SKOK, LLC
7850 Walker Drive, Suite 160
Greenbelt, Maryland  20770
(301) 459-8200

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*8,700*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: August 27, 2015                    /s/ Richard A. Finci
                                          *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 27th day of August, 2015, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Nicholas J. Patterson
> Hollis R. Weisman
> OFFICE OF THE U.S. ATTORNEY
> 6500 Cherrywood Lane, Suite 200
> Greenbelt, Maryland 20770
> (301) 344-0190
>
> *Counsel for Appellee*

I further certify that on this 27th day of August, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ Richard A. Finci
*Counsel for Appellant*